MEMORANDUM OF DECISION
On June 4, 1998, the Department of Children and Families, hereafter CT Page 10357 "DCF", filed petitions for the termination of the parental rights of Adriana M. and Carmelo A., II to their two children, Carmelo A., III and Christina A. Neglect petitions were filed in August, 1996. On September 9, 1996, the children were removed from their caretaker on an order of temporary custody (Levin, J.) They were adjudicated neglected on November 14, 1996 and have remained in the care of DCF since that time.
The termination petitions alleged that the parents have abandoned their children, that they have failed to rehabilitate so that they could parent these children, who were adjudicated neglected in prior proceedings, and that there is no ongoing parent-child relationship between them. Connecticut General Statutes § 17a-112 (c)(3)(A), (B) and (D).
The trial on the termination petitions took place on July 19, 20 and 21, 2000. Both parents attended the trial and through their counsel vigorously contested the petitions. For the reasons set forth below, the court grants the petitions and finds that it is in the best interests of the two children to terminate their biological parents' rights to them.
From the evidence presented, the court finds the following facts:
 A. FACTS 1. Adriana M., the mother of the children.
Adriana M. is now twenty-three years old. Her childhood was traumatic and extremely difficult. She is the fifth of eight children and her mother died when she was six years old. She then was cared for by her maternal grandmother, who was an alcoholic and whose family was involved with DCF. Adriana reports that she was repeatedly raped while living in her grandmother's house by her uncle and grandfather. She was removed from her grandmother's care and placed into foster care. She reports that she began to use heroin at twelve years of age and then also cocaine. She only completed the tenth grade. She was still a child herself, just sixteen, when Carmelo, III was born. She left him with various care-takers when he was an infant, while she used and sold drugs and engaged in prostitution. Because of her criminal life style, she was incarcerated for periods of time. Her life had not changed when Christina was born just two years later. In early 1996, Adriana left both of her children with a family friend, Ms. F., who cared for them appropriately until August of 1996. DCF became involved to monitor the situation, as the children were only informally placed with Ms. F. Adriana would occasionally visit the children and stay at the F. home, but was mostly "out on the streets." In August, 1996, DCF filed neglect petitions and when Ms. F. was arrested and Adriana nowhere to be found, the children were placed in foster care, where they have remained since. Their father CT Page 10358 was then incarcerated and there were no other relatives available to care for the two children.
The period of time from 1996 to the filing of the termination petitions in June, 1998 was characterized by Adriana's fitful and marginal attendance at various drug and alcohol treatment programs, from which without exception she was discharged for failing to attend and participate. The social study catalogues an heroic effort on the part of DCF to a woman who appeared determined to continue to lead a drug-addicted, destructive life.[2] Services were offered after it was obvious that Adriana had not demonstrated any desire to benefit from them. Two referrals were made to the Day Top Treatment Center. After these referrals, Adriana was arrested and incarcerated. In September, 1997, the DCF social worker offered to refer Adriana to counseling, which she did not pursue. There were three referrals to the Advanced Behavioral Health network of treatment programs. The first referral ended when Adriana did not attend her intake appointment. During the second referral in August, 1997, intensive outpatient treatment was recommended which Adriana did not attend. During the third referral in early 1998, a hair test was conducted which showed that Adriana was still using opiates and morphine. Adriana made attempts to help herself and referred herself to Project Courage in September, 1997 and then to the YWCA in the same month. A counselor from the YWCA program testified that Adriana made impressive progress in the fall of 1997. By November, 1997, however, she was discharged because of her lack of compliance with the program. By April, 1998, Adriana was in a methadone maintenance program, in which she initially did not do well. Due to her continued lack of progress, DCF filed termination petitions for both children on June 4, 1998.
Expectations were set for Adriana by the court as well as a service agreement on January 9, 1998, which Adriana signed. The agreement made it very clear what was expected of her in order to be reunited with her children. Primary among the steps Adriana had to take was drug treatment. She was also to find suitable housing and enter job training. She was to keep DCF apprised of her whereabouts and she was to call prior to any visits with her children to confirm that she would attend.[3]
Her housing was a problem, as for considerable period of time she resided in a hotel, which was occupied by known drug users and where prostitution occurred. Her whereabouts were frequently not known to DCF, the social worker testified, and it was hard to find Adriana to offer her services for rehabilitation.
Visitation had also been inconsistent. Adriana did not call DCF to schedule visitation from the time the children were placed into foster care in September, 1996 until February 5, 1997. After the first visit, she was incarcerated. Visitation occurred in prison in March, 1997 with CT Page 10359 Christina, but not in April because Adriana had violated prison behavior rules. Another visit was held in July, 1997, just before her release from incarceration, again only with Christina. The next visit took place on August 13, 1997 at the DCF office and the last visit took place on October 3, 1997. At the August visit, Christina did not appear to know her mother and Carmelo appeared terrified of her and hid behind a chair. Carmelo had an extreme reaction to visit after the visit ended. became aggressive with his social worker and had nightmares and screaming fits in his foster home that evening. Because of the children's special needs, the therapist treating them was concerned about continued visitation. After the visit on October 3, 1997, DCF terminated further visitation at the recommended of the therapist. Adriana has not had any visitation with the children since that time.[4] By October 8, 1998, the court determined that further reunification efforts were no longer appropriate.
After the filing of the termination petitions, Adriana began to make progress in treatment. She was expecting her third child at the time and this seems to have turned her life around. At the time her child was born in 1998, she had reasonable housing and more than adequate supplies to care for her child. She had continued with the methadone treatment program and after the child's birth, stopped even using this support. Since then, she has been able to remain free of drugs and sober. She is married to the father of her youngest child and has been able to parent this child, who remains in her care at the present time. Her achievement against all odds is impressive and she is to be congradulated for turning her life around.
2. Carmelo A., II, the father of the children,
Carmelo A., II is now twenty-eight years old. His early years were not as traumatic as Adriana's. However, he stopped going to school after the seventh grade and began to use drugs himself, admitting to using heroin and cocaine. Carmelo A., II and Christina are his only children and he has spent much of their childhood incarcerated. On April 15, 1998, he was convicted of possession of narcotics with intent to sell and sentenced to twelve years of incarceration, suspended after five years with a period of probation. While incarcerated, he attended a general equivalency diploma program, took the drug education available to him and was able to complete the Tier I and Tier II programs. He also attended NA meetings, as they were available to him. No expectations were set for him as he was incarcerated and DCF was not able to offer him any independent programs, other than those available in the correctional facility in which he was housed. However, on March 12, 1997, Carmelo signed a service agreement, which obligated him to maintain a drug free life style. He was able to do this while incarcerated. CT Page 10360
He also had monthly visitation while incarcerated and was able to interact well with his children under the limited circumstances possible. The social worker testified that he seemed to engage his children and they with him. His son called him "Poppy" and understood that this was his father. However, the progress that he had made, ended with his release form incarceration. He was released in March, 1998 and after that did not contact DCF or request a visit with his children until August, 1998. He was finally able to see the children during a court ordered evaluation in September, 1998, during which session he was unable to control his children, outside of the structured prison environment. He did not call DCF to inquire about them and did not send cards, as he had in the past. He did send presents. In October, 1998, the court determined that further reunification efforts were no longer appropriate, and Carmelo has not seen his children since the evaluation session.
Whatever progress Carmelo may have been able to make, had he been in the community longer, was cut short by his re-arrest and conviction on March 11, 1999 for violation of probation. He was sentenced to serve an additional three and one-half years. He was incarcerated at the time of trial and will be incarcerated for some years to come.
3. The children, Carmelo A., III, and Christina A.
Carmelo was three years and four months old in 1996 when he was first placed in foster care. He is now seven. Because of the disruptive care arrangements during his infancy, Carmelo has difficulty attaching to people. His difficulties have not been helped by his multiple foster care placements. When Carmelo was first removed, he was assessed at Bridgeport Hospital which prepared a Health and Development evaluation report on October 10, 1996, a month after he was removed from his family. At that time, Carmelo was physically aggressive towards his sister and had difficulties in the foster home. of greatest concern at that time was his personal and social functioning, although his cognitive development was about ten months below his chronological age and his language ability also lagged behind his age level. The evaluator concluded that Carmelo was "finding it very difficult to accept adult guidance and limit setting."[5] The report recommended a preschool program to aid the child in his development.
Carmelo was initially placed with his sister and was hitting her and biting her. Christina's behavior's were more extreme than her brother's and after a month, the children were placed elsewhere as the foster home was not equipped to handle the children's specialized needs. For the next four months, the siblings were in their second foster home, where in February, 1997, DCF substantiated limited physical abuse and removed the CT Page 10361 children. After this, Carmelo and Christina were separated, as there was no home to take them both. For about three weeks, Carmelo remained in the next placement, where he was extremely aggressive, hitting and biting. He had temper tantrums and was difficult to calm down. By March, 1997, he was placed in a therapeutic foster home through Boys Village. His behavior deteriorated further with all these changes and he was psychiatrically hospitalized for three weeks ending on April 7, 1997. Carmelo's luck in foster care placements did not change. His next placement ended after more than a year on May 8, 1998 as his foster mother was terminally ill.
Fortunately, Carmelo's next placement is the one in which he has remained and where he has improved. His foster mother testified at trial concerning both children, as Christina came into the home more than a year later, on July 17, 1999. She testified that she and her husband are prepared to adopt both children, should they become available for adoption. The extent of the improvements that Carmelo has made in this foster home became apparent as his foster mother, therapist and his treating psychiatrist testified. The foster mother notes that initially Carmelo had difficulty sleeping, he could not attend to tasks, he was very hyper and has learning disabilities. The psychiatrist evaluated Carmelo on July 20, 1999. Help was sought because of Carmelo's distractibility and hyperactivity, as reported by his foster mother. At that time, Carmelo had begun on Ritalin for his ADHD symptoms. The psychiatrist testified that Carmelo was a very anxious little boy and afraid of separation from his foster mother. In the initial session in 1999, he was unable to focus and was very disorganized. He was unable then to come into the psychiatrist's office and look at "the setting and choose a number of things to do," tasks a child his age should have been able to perform. He suffered from what the evaluator termed "motor overflow," an inability to control his gross motor movements. Now, he is able to focus and exhibits better motor control and school behavior, although he remains a special education student. The psychiatrist testified that Carmelo's foster mother possesses "psychological-mindedness" and knows where the child is at all times and is in tune with his developmental needs. He also noted that both children need "a great deal of structure, anticipation and nurturing and that their chances of success are very good if they have these three elements." He stated that the present foster parents are able to supply this for both children. In his opinion, it is the best interests of both children to remain in this placement.
The children's therapist also testified. She began to work with Carmelo over a year ago and began to work with Christina in January, 2000. She noted that when Carmelo first came to her sessions, he had attention problems and exhibited poor concentration and hyperactivity. He had CT Page 10362 problems in school as well. He was having nightmares and was very anxious. She stated that he no longer exhibits the level of anxiety that he had before, that his nightmares have subsided and that his school attention has improved. She noted, as did the psychiatrist, that he had negative memories of his mother and remembers incidents of hitting and abuse by her. At times, he suffers from flashbacks, which trigger nightmares and other acting-out behavior. She further stated that she found his statements about his mother credible and that he was not confused as to who had neglected and abused him. She noted that his present foster parents were his psychological parents, those adults he looks to care for him and those that he has mentally internalized, who are "consistent, stable and predictable." She stated that the best interests of the children were to remain in their present foster home and to be adopted. They are "where they are secure and comfortable and where they can grow as they should as children." In her opinion, it would be "emotionally and psychologically devastating to them," if they were removed from their foster family. She did not believe any one else could meet the needs of these children as they see the foster parents as their psychological parents.
Both children were also psychologically evaluated by court order on December 12, 1999. At that time, Dr. Ruth Grant concluded that it would not be in the children's best interests to have an interactional session with their mother. She based her recommendations upon observing them, their special education needs and their reports of physical abuse and neglect. She stated the children have significant "emotional and intellectual needs." She noted that both are in therapy and that parenting them requires setting consistent and strong controls, lots of positive reinforcement, good boundary setting and structure. Based on Carmelo's memories of his mother and Christina's lack of knowledge of her mother, she believed that there should be no visitation with their mother, as this was not in their best interests.
Christina, at the time of her initial foster care placement, was only sixteen months old. She is now five years old. She was also evaluated at the Bridgeport Hospital a month after her removal. At that time, her foster mother reported that she cried incessantly. Christina indiscriminately went up to strangers and grabbed at them in order to be picked up. She also ate anything, including inedible objects. She liked to play with her diaper and would shred the diaper and smear feces around as well as eating it. She also masturbated to such an extent that her skin was chafed. Despite being placed in sleepers, she continued to remove her clothing to engage in this behavior. Her first placement ended because of her extreme behaviors. Her evaluator noted that she "presented with developmental concerns in each of the areas assessed," her gross and fine motor areas needed assistance. Her cognitive, language and self-help CT Page 10363 skills were in need of support. As with her brother, her social and emotional development was also of the greatest concern.
After the second joint placement ended in February, 1997, Christina was placed separately from Carmelo. Her next placement ended after six months, the fourth placement ended after four months because the foster parents requested the children's removal. Her next placement ended after eight months, because her behaviors continued to demonstrate that she required a therapeutic placement. At that point, she came to live with her brother in his foster home, where she continues to reside. When she was evaluated by the psychiatrist in early 2000, he noted that she was a "severely anxious child with indiscriminate behaviors." He believed that she had an attachment disorder. Her therapist testified that when she began in therapy in January, 2000, Christina was suffering from severe tantruming behaviors, screaming, biting and throwing objects. She noted Christina was extremely demanding and would engage in these behaviors at school as well as at home. Now, some seven months later, she is not acting in this manner. In the therapist's opinion, the foster family has provided her with the stability and nurturing to be able to function better. She noted that she addresses behavior modification issues with Christina "because of her poor boundaries. I set limits and redirect her and provide higher frustration level training to strengthen her ego as it is very fragile at this time." The therapist was aware that that there were allegations that Christina had been sexually abused in one of her foster homes. She is not now dealing with sexual abuse in her therapy as "her ego is too fragile to deal with these issues. . . . Now the most important issue in her treatment plan is to maintain her in an environment that is nurturing, stable and productive."
Christina will be entering kindergarten in the fall. Last year she attended preschool and her time there was "very rough", her foster mother reported. She has improved tremendously and won three awards; as the best puzzle maker, the most improved and for perfect attendance. Her foster mother noted that when Cristina wakes up, she usually cries that she does not want to go to school. Now, she does this less. Right now she is working with her on Spanish, telling her colors and Christina will help her preparing family meals. At night they will sing, read a story, say their prayers and then go to bed. She noted that sometimes still Christina has a hard time sleeping, but that this has also improved. The foster mother testified that she and her husband support the children with their Boy's Village worker, their therapist and psychiatrist and children's society at church. In addition, the foster parents receive some regular training and are a part of a support group at Boy's Village to talk about different parenting issues and strategies. The foster mother is very involved with their schooling and attends their schools each week and works with their individual teachers. She does additional CT Page 10364 work with each of them on their reading and other school tasks. She also advocates for them at school to make sure that their special needs are being addressed and met.
 B. ADJUDICATORY FINDINGS 1. Reasonable Reunification Efforts
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, provided that this finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate." Connecticut General Statutes § 17a-112 (c)(1). The court made such findings on October 8, 1998. (Rogers, J.) The court does find, from the clear and convincing evidence that reasonable reunification efforts had been made prior to the date of these findings. Such efforts were hampered by Adriana's continued drug use and the very long period of time which had elapsed from the time of the placement of her children and her decision to begin to work toward rehabilitation. In Carmelo's case, they were hampered by his incarceration and his lack of regular participation when he was at liberty in the community.
2. Adjudicatory findings
 (a) Adriana M.
Both children were adjudicated neglected and committed to the care and custody of DCF for a period of twelve months on November 14, 1996. Their commitment has been extended on several dates since that time. The court further finds, by clear and convincing evidence, that as of June 4, 1998, Adriana had not achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, she could assume a responsible position in her life. Connecticut General Statutes § 17a-112
(c)(3)(B). Her recovery was only in its early stages at that time and still shaky.
"`Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M., 6 Conn. App. 194, 203, 504 A.2d 532
(1986), see also; In re Juvenile Appeal, 1 Conn. App. 463, 477,473 A.2d 795 (1984). The court concludes Adriana's lack of rehabilitation must be seen from the perspective of these children, as Adriana was not able to maintain a reasonable relationship with her children. CT Page 10365
The statutory framework requires the court to analyze the parent's rehabilitation "as it relates to the needs of the particular child" and consider if such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 1167, 554 A.2d 722 (1989), In reHector L., 53 Conn. App. 359, 366-367, ___ A.2d ___ (1999). Because of this requirement that the court predict what may happen within a "reasonable time" after the filing of the termination petitions, the court must consider not only Adriana's conduct prior to the filing of the petitions, but also her conduct after that time. In this case, this was a period of slightly more than two years, during which she has made tremendous and laudable progress. While she has rehabilitated herself so that she can cafe for her youngest child, her recovery consumed much of the early childhood years of her two older children. They needed to move on emotionally during her many attempts to become sober. They have extreme special needs and need special support. At this point in time after the many unfortunate changes in their lives, they are both together and with people who have become their parents in all ways except the one closed to them by virtue of the children's earlier birth. It is, all the experts agree and the court concurs, not in their best interests to re-establish a tie to a person they have not known for years. If such time were permitted and they were removed from their foster parents, it would be devastating to the children.
The termination petitions also allege that there is no ongoing parent-child relationship between Adriana and the two children and to allow further time for the development of such a relationship would be detrimental to the best interests of the child. Connecticut General Statutes § 17a-112 (c)(3)(D). "The question is whether they [the facts] substantiate a finding by clear and convincing evidence that no relationship ever existed between the parent and child, or that the relationship has terminated, without any future hope for its establishment or reestablishment." (Internal brackets mine.) In reMigdalia M., 6 Conn. App. 194, 211, 504 A.2d 532 (1986); In re JuvenileAppeal (84-3), 1 Conn. App. 463, 473 A.2d 795, cert. denied, 193 Conn. 802,474 A.2d 1259 (1984); In re Juvenile Appeal (Anonymous), 177 Conn. 648,670-671, 420 A.2d 875 (1979).
In 1997, when visitation ended, Christina did not recognize her mother as her mother during the first DCF visit after her release from incarceration. Indeed, she had never cared for her as an infant and Christina had already then been in foster care most of her life. Carmelo was actively afraid of his mother. The court concludes from the clear and convincing evidence that this ground has also been established by the clear and convincing evidence. While as noted, it is possible that a tie could be reestablished as Adriana is now leading a sober life, it is not CT Page 10366 in the children's best interests to deny them permanency while such an experiment takes place.
The last ground alleged is that Adriana has abandoned her children as that is defined in Connecticut General Statues as the parent failing to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. Connecticut General Statutes § 17a-112
(c)(3)(B). While Adriana during the time prior to the filing of the termination petition, has exhibited a reasonable degree of interest by seeking regular visitation, she has not reliably called to inquire about her children's welfare nor, while leading a drug addicted life, maintained a "reasonable degree of responsibility" for these children. She has not abandoned them in the colloquial sense of the word, but within the legal meaning of the term, she has done so and the court so finds from the clear and convincing evidence.
(b) Carmelo A.
The same three grounds are alleged against the children's father. As to his failure to rehabilitate so that he could care for the children, the court finds from the clear and convincing evidence that Carmelo has not rehabilitated. He was not able to refrain from drug abuse while in the community and did not take the steps necessary to keep from returning to prison. He was not consistent able to keep the visitation schedule when not incarcerated. He is now incarcerated for several additional years and would not be able to care for them for some years to come.
He, like Adriana, no longer has, if indeed he ever had an ongoing parent-child relationship with Christina and Carmelo. He has never parented these children nor cared for them on a day-today basis. They no longer have any relationship with him and it is not in their best interests, given their special needs, to wait longer to reestablish such a relationship. He, too, has abandoned them in the legal meaning of the term. He has not inquired about them regularly. He has sent some gifts and cards. He believes that, because they are his natural children, he should maintain a tie with them. But he has never "maintained a reasonable degree of responsibility" for them. The court finds these two grounds proven by the clear and convincing evidence.
 C. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (e):
1) Appropriate and timely services were provided by DCF to the family. The services include services to benefit Adriana to deal with issues of CT Page 10367 substance abuse and housing. DCF also provided visitation and case management services.
2) As previously noted, the court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family, until the court order that further efforts were not required.
3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court finds that reasonable court expectations were set for both parents, who were not able to fulfill them. In addition, service agreements were entered into, which were also not complied with.
4) The feelings and emotional ties of the children with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the children for at least one year and with whom the children have developed significant emotional ties. In this case, the record is clear that Carmelo and Christina are bonded to their foster parents and have no relationship left with their biological parents.
5) Finding regarding the ages of the children. Carmelo is now seven years old and Christina is five.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the children to return them to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the children as part of an effort to reunite the children with them, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the children. As detailed above, the court finds that father has not made adequate changes to accommodate the care and nurturing of these children. While Adriana has now made such changes, they have come too late for her two oldest children to benefit from them.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the child by the unreasonable act or conduct of the other parent of the child or the unreasonable act of any other person or by the economic circumstances of the parent. No such conduct is noted. DCF has taken many steps to encourage these parents to have meaningful relationships with their children, which they have been unable to accomplish within a reasonable period of time, given these children's ages and needs. CT Page 10368
 D. DISPOSITION The Best Interests of the Children
In hearing a termination of parental rights case, the court must first determine whether or not the grounds for termination have been proven by clear and convincing evidence. If so, only then may it consider what action is in the best interests of the children at issue. As has been noted:
 "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Citations omitted; internal quotation marks omitted.) In re Danuael D., 51 Conn. App. 829, 835-37, 724 A.2d 546
(1999).
The court has found that all grounds for termination of the parental rights of the biological parents of the children have been proven by clear and convincing evidence. The court has made the seven statutory findings required, which all weigh in favor of termination being in these children's best interests. The court concludes, from the clear and convincing evidence that these children cannot wait any longer for permanency. Despite their chaotic early years while in only the nominal legal care of their mother and despite the many unfortunate foster care placements, they have reached a safe haven. The experts are unanimous that the children have done well with their present foster parents, who have the personal characteristics to be able to provide for these special needs children. Our courts have noted the "deleterious effect of prolonged temporary care of abused and neglected children." In re JuvenileAppeal (84-CD), 189 Conn. 276, 455 A.2d 1313 (1983). In addition, "[because of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In reAlexander V., 25 Conn. App. 741, 748, 596 A.2d 930 (1992).
Carmelo and Christina view their foster parents as those individuals who are able to provide for them emotionally. The court concludes, from the clear and convincing testimony, that it is in the best interests of these two children to have permanency and stability in their lives. CT Page 10369 Towards that end, the court concludes that it is in Carmelo and Christina's best interests that their parents' rights to them be terminated.
The court therefore orders that a termination of parental rights enter with respect to Adriana M. and Carmelo A. The foster parents have expressed a desire to adopt Carmelo and Christina and the court directs that they be given first consideration in any adoption. The court further orders that a permanency plan for Carmelo and Christina be submitted within sixty days. A review plan for them shall be filed in accordance with state and federal law.
Barbara M. Quinn, Presiding Judge Child Protection Session